**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 21, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

CEDRICK LOCKETT,

    Plaintiff - Appellant,

v.

WEBCO INDUSTRIES, INC., previously
named as Webco, Inc.,

    Defendant - Appellee.

No. 21-5041
(D.C. No. 4:19-CV-00593-CVE-CDL)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BACHARACH**, and **CARSON**, Circuit Judges.
_____

Cedrick Lockett, pro se, appeals the district court's order granting summary

judgment in favor of Webco Industries, Inc. (Webco) on his claims for harassment in

violation of Title VII of the Civil Rights Act of 1964 (Title VII) and invasion of

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

privacy under Oklahoma law.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.[1]

## I.  BACKGROUND

The district court found the following undisputed material facts on summary judgment.  Webco, which is in the business of manufacturing industrial tubing, hired Mr. Lockett, who is African American, in June 2017.  His primary duties included cutting tubes to length, deburring them, and then packaging and tagging the tubes.

As a new employee, Mr. Lockett received a copy of Webco's employee handbook, which required any employee who experienced or witnessed discriminatory conduct to immediately report the conduct to the appropriate manager. The handbook further contained a workplace-violence policy that prohibited employees from verbally or physically threating another employee.

At the time he was hired, Mr. Lockett also learned about Webco's drug-testing policy, which provided that "all employees will be subject to random testing for drugs; no employee will be exempt from the possibility of a random test."  R. at 327 (brackets and internal quotation marks omitted).

Chris Opitz was the general manager at the plant where Mr. Lockett worked. Mr. Lockett had a good working relationship with Mr. Opitz throughout most of his employment.  For example, Mr. Lockett sought advice from Mr. Opitz about a custody dispute involving his son and Mr. Opitz loaned him money to buy new tires

---

[1] Mr. Lockett also asserted a claim for retaliation under Title VII; however, he later abandoned that claim.

for his car.  Mr. Lockett described Webco as a "great" place to work and credited the company for "t[aking] great care of him." *Id.* (brackets and internal quotation marks omitted).

One day in October 2018, Mr. Lockett was talking to two white coworkers about a loss by the Oklahoma City Thunder basketball team and used the "n" word several times in referring to a Thunder player.  Another white coworker—with the first name Todd—overheard Mr. Lockett's comments and used a variation of the "n" word to provoke a reaction from Mr. Lockett, who then threatened to kick Todd's "ass." *Id.* at 328 (internal quotation marks omitted).  The incident was reported to Mr. Opitz by one of the other coworkers.

Following an investigation, Webco determined that Todd violated the company's anti-harassment policy and suspended him for two days without pay. Webco issued Mr. Lockett a verbal warning for violating its anti-harassment policy by threatening to use physical violence against a coworker.  According to Mr. Lockett, he then requested a meeting with human resources; however, on the day scheduled for the meeting he had a panic attack and failed to attend.  In a follow-up, Mr. Opitz was assured by Mr. Lockett that he was satisfied with the way the incident with Todd had been handled.

In December 2018, Mr. Lockett sent Mr. Opitz a picture of some string left at a workstation that he thought had been tied to look like a noose.  The picture was taken in July when Mr. Lockett observed the so-called noose; however, he waited nearly five months before he reported it to Mr. Opitz.  He told Mr. Opitz that he

suspected a coworker named Darren was responsible. Following an investigation, Mr. Opitz determined that Darren did not leave the string at the workstation, or if he had, it was not left there to harass Mr. Lockett.[2] Mr. Opitz met with Mr. Lockett to discuss his findings and believed that the matter was resolved. In January 2019, Mr. Lockett received a promotion to the skill level of "expert" and was also permitted to teach a class to his coworkers. *Id.* at 329 (internal quotation marks omitted).

On April 25, 2019, Mr. Lockett, along with several other employees, was randomly selected for a drug test. The testing was administered by a female medical-review officer from One Source Occupational Medicine (One Source). Mr. Lockett's first urine sample was outside the acceptable temperature range and he was told that he needed to give a second, observed sample. In response, Mr. Lockett ran out of the building, jumped over a fence, and removed something from his car. Mr. Lockett later testified that he thought something "fishy" was going on, so he went to his car to retrieve his phone to record what was occurring, although he admitted it was against company policy to make any audio or video recordings inside the plant. *Id.* (internal quotation marks omitted). Webco's human resources manager informed Mr. Lockett that if he refused to provide an acceptable urine sample his employment would be terminated.

---

[2] Webco produced a video demonstrating how some employees tie a loop on the end of a separation string to make the process of securing tubes easier and explained that Mr. Lockett may have mistaken the string with a loop on one end for a noose.

Eventually, Mr. Lockett agreed to a second sample and chose a Webco supervisor to observe the test; however, when they got into the bathroom stall, Mr. Lockett refused to allow the supervisor to watch him urinate into the cup. When the second sample also tested outside the acceptable temperature range, Mr. Lockett was instructed that he would have to give a third, observed sample and refusal to do so would be treated as a positive test. Mr. Lockett said "fuck this drug test" and walked off the job. *Id*. at 330 (internal quotation marks omitted). His employment was officially terminated later that day.

After his claim was denied by the Equal Employment Opportunity Commission, Mr. Lockett filed suit in which he asserted claims for (1) a hostile work environment based on Todd's use of the "n" word and the so-called noose observed at his workstation and (2) invasion of privacy based on drug-testing procedures that required an observer. The district court granted summary judgment in favor of Webco. Mr. Lockett appeals.

## II. STANDARD OF REVIEW

"We review the district court's grant of summary judgment de novo." *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party," and a fact is material

when it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Moreover, "[a]lthough a pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers, . . . this court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (brackets and internal quotation marks omitted). One of those rules is Federal Rule of Appellate Procedure 28(a)(8)(A), which requires the appellant's brief to contain an "argument" with "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Consistent with this requirement, "we routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007). Instead, inadequately briefed issues "will be deemed waived." *Garrett*, 425 F.3d at 841.

Here, Mr. Lockett fails to advance any adequately developed arguments on appeal. Indeed, Mr. Lockett never mentions the district court's order or any of the several grounds on which it granted Webco's motion for summary judgment, nor does he cite to the record or provide any legal authority to support his claims for harassment or invasion of privacy. Thus, the issues are waived. But even if Mr. Lockett had properly challenged the order, our review reveals no error.

6

## III.  DISCUSSION

### A.  *Harassment*

According to Mr. Lockett, Webco created a racially hostile work environment based on Todd's one-time use of the "n" word and someone leaving a piece of string with a loop tied on one end at his workstation.  Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "This includes an employee's claims of a hostile work environment based on race or national origin discrimination."  *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  However,

> [t]o survive summary judgment on a claim alleging a racially hostile work environment, [the plaintiff] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim was targeted for harassment because of his race or national origin.

*Id.* (ellipses, brackets, and internal quotation marks omitted).  The plaintiff cannot meet this burden "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs."  *Id.* (internal quotation marks omitted).

But even if the plaintiff establishes a hostile work environment, the employer is not "liable for an employee's unlawful harassment [unless] the employer was negligent with respect to the offensive behavior."  *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 737 (10th Cir. 2014) (internal quotation marks omitted).  Under a

7

negligence theory, the employer is absolved of liability for the known acts of harassment by an employee if it undertakes remedial and preventative action "reasonably calculated to end the harassment." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998) (internal quotation marks omitted).  We agree with the district court that Mr. Lockett's harassment claim fails for two reasons.  First, the alleged racial harassment was neither pervasive nor severe; to the contrary, there was a single incident of alleged racial enmity and one racial slur.  Second, Webco was not negligent; rather, the company promptly investigated both incidents and suspended Todd for two days without pay for uttering the "n" word.

## B.  *Invasion of Privacy*

According to Mr. Lockett, Webco invaded his privacy when it failed to ensure that One Source had a male technician on site who could observe the second urine sample and it was highly offensive to require him to give an observed sample in the presence of a Webco supervisor.  He added that his privacy was also invaded when the supervisor touched his shoulder during the test.  We agree with the district court that Webco was entitled to summary judgment on this claim.

Oklahoma recognizes the tort of invasion of privacy.  The claim has two elements:  "(a) a nonconsensual intrusion (b) which was highly offensive to a reasonable person." *Gilmore v. Enogex, Inc.*, 878 P.2d 360, 366 (Okla. 1994).  Under this court's interpretation of Oklahoma law, "an intrusion occurs when an actor believes, or is substantially certain, that he lacks the necessary legal or personal

permission to commit the intrusive act." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1221 (10th Cir. 2003) (brackets and internal quotation marks omitted).

The Oklahoma Supreme Court has determined drug testing in the workplace is legal and does not invade an employee's privacy because the employer has a significant interest in maintaining a drug-free workplace and such testing is not highly offensive to a reasonable person. *See Gilmore*, 878 P.2d at 366-67. As to the procedures for the collection of urine samples, Oklahoma State Health Department regulations provide that

> [i]f the temperature of a specimen is outside the [acceptable range], that is a reason to believe that the individual . . . alter[ed] or substitute[d] the specimen, and another specimen shall be collected under direct observation of a same gender collection site person and both specimens shall be forwarded to the testing facility for testing.

Okla. Admin. Code § 310:638-1-8(f)(13). Moreover, the Code contemplates that a representative of the employer may directly observe an employee giving a urine sample to prevent tampering with the specimen. *See id.* at § 310:638-1-8(e) ("No employer or representative, agent or designee of the employer shall directly observe an applicant or employee in the process of producing a urine sample, provided collection occurs in a manner reasonably calculated to prevent substitutions or interference with the collection or testing of reliable samples.").

The undisputed facts were that the first urine sample provided by Mr. Lockett was outside the acceptable temperature range, which in turn provided legal grounds to require a second sample with a company-designated observer to ensure the integrity of the procedure. Thus, there was no intrusion. Moreover, the supervisor's

9

touch on Mr. Lockett's shoulder was not an invasion of privacy because it would not be highly offensive to a reasonable person. Mr. Lockett argued the observer "grab[bed]" his shoulder in an "attempt[] to turn [him] around" because Mr. Lockett had turned his body to obstruct the observer's view. R. at 282. We agree with the district court that, under the circumstances, this would not be highly offensive to a reasonable person, and Oklahoma law clearly establishes that Webco had the legal authority to require [Mr. Lockett] to participate in a drug testing program and require an observed sample under the circumstances present in this case." R. at 339-40. Although "[Mr. Lockett] may subjectively believe that the testing procedures were an invasion of privacy, . . . he has not shown that Webco lacked legal authority to require a second observed sample or that the testing procedures were highly offensive to a reasonable person." *Id.* at 340.

## IV.  CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court

Joel M. Carson III
Circuit Judge